IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRANDON MAYFIELD, an individual,                  Civil No. 04-1427-AA
MONA MAYFIELD, an individual, and                    OPINION AND ORDER
SHANE MAYFIELD, SHARIA MAYFIELD,
and SAMIR MAYFIELD, individuals,
by and through their guardian
ad litem Mona Mayfield,

          Plaintiffs,

     vs.

UNITED STATES OF AMERICA,

          Defendant.
_____

Gerry Spence
The Spence Law Firm LLC
15 South Jackson Street, P.O. Box 548
Jackson, Wyoming 83001

Elden M. Rosenthal
Rosenthal & Greene, P.C.
1001 S.W. Fifth Avenue, Suite 1907
Portland, Oregon 97204

Michele Longo Eder
Michele Longo Eder, LLC
4 SW High Street, P.O. Box 1530
Newport, Oregon 97365
     Attorneys for plaintiffs

Peter D. Keisler
Assistant Attorney General
Karin J. Immergut
United States Attorney
Jeffrey S. Bucholtz
Principal Deputy Assistant Attorney General
Elizabeth J. Shapiro
Assistant Director
Renee S. Orleans
Nicholas A. Oldham
Trial Attorneys
U.S. Department of Justice
Federal Programs Branch, Civil Division
20 Massachusetts Avenue, N.W., P.O. Box 883
Washington, D.C. 20044
     Attorneys for defendant United States of America


AIKEN, Judge:

     Plaintiffs' Amended Complaint requests declaratory relief
that the Foreign Intelligence Surveillance Act ("FISA"), as
amended by the Patriot Act, is unconstitutional.

PROCEDURAL BACKGROUND

_____Plaintiffs filed this case on October 4, 2004, alleging
various civil rights violations.  Specifically, plaintiffs
alleged a Bivens[1] claim for unlawful arrest and imprisonment and
unlawful searches and seizures against four individual
defendants. See Complaint, Claims 1-10, ¶¶ 1-74.

     Plaintiffs also brought a claim under the Privacy Act, 5
U.S.C. § 552a, alleging the defendants began "leaking"
information contained within the Department of Justice ("DOJ")

_____
     [1]  Bivens v. Six Unknown Named Agents of the Federal Bureau
of Narcotics, 403 U.S. 388 (1971).

Page 2 - OPINION AND ORDER

and the Federal Bureau of Investigation ("FBI") files to the national and international media regarding plaintiff Brandon Mayfield ("Mayfield") and his arrest. Id., Claim 11, ¶¶ 75-86.

Plaintiffs moved for injunctive and declaratory relief against defendants DOJ and the FBI FISA searches and surveillance. See Pub. L. No. 95-511, 92 Stat. 1790 (Oct. 25, 1978), 50 U.S.C. ¶¶ 1801-1811. Id., Claim 12, ¶¶ 87-90. Claim Twelve included plaintiffs' challenge to the constitutionality of portions of the "Patriot Act" (The United and Strengthening of America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001)). Id., ¶ 89. Finally, plaintiffs brought a claim for the return of property improperly seized. Id., Claim 13, ¶¶ 91-93.

Subsequently, motions were filed by both parties. The court heard oral argument on motions, and on July 28, 2005, issued an opinion, Mayfield et al. v. Gonzales et al., 2005 WL 1801679 (D. Or. 2005)(doc. 83), ruling, in part, as follows: (1) defendant John T. Massey's motion to dismiss based on qualified immunity, or lack of personal jurisdiction, or in the alternative for summary judgment was denied; (2) defendants Werder's, Green's and Wieners' motion to dismiss or alternative motion for summary judgment based on qualified immunity, lack of personal jurisdiction, failure to state a claim or alternatively, for

Page 3 - OPINION AND ORDER

summary judgment was denied; and (3) defendants DOJ's and FBI's motion to dismiss counts twelve and thirteen of the Complaint was denied.

On September 23, 2005, defendants filed an interlocutory appeal of this court's ruling with the Ninth Circuit Court of Appeals. However, on December 7, 2006, the Court of Appeals granted appellants' motion under Federal Rule of Appellate Procedure 42(b) for voluntary dismissal of their appeal. In November 2006, the parties informed this court they had reached a stipulated settlement regarding all issues except the one currently before this court. The court signed the stipulated settlement agreement on November 29, 2006.[2]

On December 6, 2006, plaintiffs filed an Amended Complaint for Declaratory Judgment. Pending before this court are the parties' cross-motions for summary judgment and defendant's motion to dismiss based on jurisdiction. The court held oral argument on September 10, 2007. The parties provided the court with written briefs, including supplemental briefs, in addition

---

[2] The Settlement Agreement signed by this court limits plaintiffs' remaining claim to a facial (rather than as-applied) challenge to 50 U.S.C. §§ 1804 and 1823. Plaintiffs' claim is to be litigated based on the Amended Complaint, the parties' Recitation of Stipulated Facts, and memoranda of law. Moreover, the relief available to plaintiffs if they prevail is a declaratory judgment that one or both of these two provisions violates the Fourth Amendment. See Stipulation for Compromise Settlement and Release ("Settlement Agreement"), attached as Def's Ex. 1.

Page 4 - OPINION AND ORDER

to comprehensive oral argument.  Following careful consideration
of all the arguments, plaintiffs' summary judgment motion is
granted, and defendant's summary judgment motion and motion to
dismiss are denied.

FACTUAL BACKGROUND[3]

In brief, the facts as alleged by plaintiffs are as follows:
On March 11, 2004, in Madrid, Spain, terrorists' bombs exploded
on commuter trains, murdering 191 persons, and injuring another
1600 persons, including three United States citizens.  Shortly
after the bombings, the Spanish National Police ("SNP") recovered
fingerprints from a plastic bag containing explosive detonators.
The bag was found in a Renault van located near the bombing site.

On March 13, 2004, the SNP submitted digital photographs of
the latent fingerprints lifted from the plastic bag to Interpol
Madrid, which then transmitted the digital photographs to the FBI
in Quantico, Virginia.  On that same day, the Latent Print Unit
of the FBI initiated an Automated Fingerprint Identification
System ("AFIS") search in an attempt to match the latent prints
received from Spain with known prints in the FBI computer system.
The FBI was unable to locate a fingerprint match.

On March 14, 2004, the FBI requested and received from Spain
higher resolution digital photographs of the eight latent prints

_____

[3] These facts are restated as set forth in the Opinion
published by this court on July 28, 2005, cited above.

and on March 15, 2004, another AFIS search was performed.  The
FBI technicians programmed the computer to return 20 candidates
whose known prints had features in common with what was
identified as Latent Finger Print #17 ("LFP #17").  On March 15,
2004, the computer produced 20 candidates that met the criteria.
Each candidate was identified by an AFIS "score," a number that
reflected a rank as to how closely the AFIS computer determined
each candidate's fingerprint matched certain features of LFP #17.
Also included was an identification number for each candidate
that allowed the FBI to retrieve the names, original fingerprint
cards, and demographic information of each candidate on the list.
Demographic information included name, date of birth, sex, race,
and social security number.  This information allowed the FBI to
perform background checks on each of the 20 candidates.

Mayfield's AFIS "score" ranked #4 on the list of 20
candidates.  Mayfield is an American citizen born in Oregon and
reared in Kansas.  He lives with his wife and three children in
Aloha, Oregon, a suburb of Portland.  Mayfield is 38 years old, a
former Army officer with an honorable discharge, and a practicing
Oregon lawyer.  Prior to his arrest, he had not traveled outside
the United States since 1994, and he had never been arrested for
a crime.  Plaintiffs allege that FBI examiners were aware of
Mayfield's Muslim faith and that this knowledge influenced their
examination of Mayfield's fingerprints.

Page 6 - OPINION AND ORDER

On March 17, 2004, a "Supervisory Fingerprint Specialist" for the FBI, Agent Green, concluded that Mayfield's left index fingerprint matched LFP #17.  Plaintiffs allege that had Green properly performed the fingerprint identification analysis, he would have been compelled to declare that Mayfield's print did not, in fact, match LFP #17.  Plaintiffs allege that Green, however, was improperly influenced by Mayfield's adherence to the Muslim faith.

Green then submitted the print to Massey, an allegedly "independent fingerprint examiner," for verification.  Massey is a former FBI employee, now retired, periodically hired by the FBI on a contract basis to "perform forensic examination of latent fingerprints."  Plaintiffs allege that when Massey was employed by the FBI, he was reprimanded on at least three occasions for erroneously "identifying" fingerprints.  Plaintiffs contend that Massey was selected to "verify" the identification because his "employment history of discipline for poor performance would strongly motivate him to agree and verify the prior identification."  Plaintiffs believe that Massey was informed of Green's prior identification of LFP #17 to Mayfield, and that Mayfield was a practicing Muslim.  Massey did, in fact, verify that Mayfield's left index fingerprint matched LFP #17.

The alleged "match" was then submitted to a senior FBI manager, Wieners, for verification.  It is FBI policy that when

Page 7 - OPINION AND ORDER

there are less than 12 points of similarity between a latent print and a known print, a senior manager must review the alleged match.  Plaintiffs allege that Wieners knew, prior to examining the print, that two examiners before him had identified and verified the purported match, and that Mayfield is Muslim. Wieners also verified that LFP #17 matched Mayfield's print.

On March 20, 2004, the FBI issued a formal report matching Mayfield's print to LFP #17.  On March 21, 2004, FBI surveillance agents began to watch Mayfield and to follow Mayfield and members of his family when they traveled to and from the Bilal Mosque, the family's place of worship; to and from Mayfield's law office, his place of employment; to and from the children's school; and to and from family activities.

Plaintiffs allege that at some point after the wrongful fingerprint identification, the FBI applied to the Foreign Intelligence Security Court ("FISC") for an order authorizing the FBI to place electronic listening devices ("bugs") in the "shared and intimate" rooms of the Mayfield family home; executed repeated "sneak and peek" searches of the Mayfield family home, occurring when the family was away from the home and performed "so incompetently that the FBI left traces of their searches behind, causing the Mayfield family to be frightened and believe that they had been burglarized;" obtained private and protected information about the Mayfields from third parties; executed

Page 8 - OPINION AND ORDER

"sneak and peek" searches of the law office of Brandon Mayfield; and placed wiretaps on Mayfield's office and home phones.  The application for the FISA order before the FISC was personally approved by the U.S. Attorney General at the time, John Ashcroft.

On April 2, 2004, Mayfield's prints were sent by the FBI to Spain.  Plaintiffs allege that by that date, the U.S. Government had already been advised by the Spanish Government that Moroccan immigrants were suspects in the Madrid bombing and had been taken into custody, and that the Spanish Government was not aware of any information connecting the Moroccans with Mayfield or anyone else in the United States.

The SNP examined the FBI's report and Mayfield's fingerprints, and concluded that there were dissimilarities in the comparison of the two prints for which there was no explanation.  On April 13, 2004, the SNP provided a written report to the FBI explaining that they had compared LFP #17 to Mayfield's fingerprints, and concluded there was no match.

On April 21, 2004, the FBI sent one or more agents to Madrid to meet with their Spanish counterparts.  Spanish authorities who met with the FBI agents "refused to validate" the FBI's conclusion that LFP #17 and Mayfield's print were a match.

Plaintiffs allege that DOJ and FBI employees "concocted false and misleading affidavits" in order to justify even more intrusive searches and ultimately to justify Mayfield's arrest as

a "material witness."  An FBI investigator, Werder, submitted a "concocted affidavit" to a federal judge of this court, which stated that Green, Wieners, and Massey considered LFP #17 a "100% positive identification" of Mayfield.  Although the affidavits stated that "preliminary findings" of the SNP "were not consistent" with the FBI fingerprint analysis, no mention was made of Spain's April 13, 2004, report to the FBI that stated the SNP did not agree with the FBI's fingerprint match of LFP #17 and Mayfield.

The affidavit included "speculative and prejudicial narratives" focusing on Mayfield's religion and association with co-practitioners.  Plaintiffs cite as an example, Werders's inclusion in his affidavit the fact that Mayfield attended a mosque and advertised his legal services in "Jerusalem Enterprises," or what are known as the "Muslim Yellow Pages," as evidence connecting Mayfield to the bombings as a material witness.  Plaintiffs respond that the "Muslim Yellow Pages" also includes advertising by major companies such as Avis, Best Western and United Airlines.  Plaintiffs allege that the affidavit submitted to this court was knowingly or recklessly false and misleading.

Due to Mayfield's protestations of innocence, and the issue of whether Mayfield's prints actually matched LFP #17, the Judge assigned to this matter ordered that LFP #17 be provided to a

court-appointed expert witness for comparison to Mayfield's known
fingerprints.  That expert, Kenneth Moses, was selected by
Mayfield and his defense attorneys.  On May 19, 2004, Moses
testified in the material witness proceeding that he had
"compared the latent prints that were submitted on Brandon
Mayfield, and [he] concluded that the latent print is the left
index finger of Mr. Mayfield."

Based on these affidavits, broad search warrants were sought
and issued.  Mayfield's family home and law office were searched.
Computer and paper files from his family home, including his
children's homework, were seized.  Mayfield was ultimately
arrested and initially held in the lock down unit at the
Multnomah County Detention Center.  His family was not told where
he was being held.  He and his family were told, however, that he
was being held as a primary suspect on offenses punishable by
death, and that the FBI had made a 100% match of his fingerprint
with the Madrid train bombing fingerprint.  Plaintiffs allege
that leaks to the media by the FBI and DOJ led to local,
national, and international headlines that Brandon Mayfield's
fingerprints linked him to the Madrid bombings.

Mayfield was ultimately arrested and imprisoned from May 6,
2004, through May 20, 2004.  On May 19, 2004, the SNP advised the
FBI, and on May 20, 2004, news reports revealed, that Spain had
matched the Madrid fingerprint with an Algerian, Ouhane Daoud.

Mayfield was released from prison the following day.[4]

STANDARDS

Motion to Dismiss

Under Fed. R. Civ. P. 12(b)(6), once a claim has been stated
adequately, it may be supported by "showing any set of facts
consistent with the allegations in the complaint." Bell Atlantic
Corp. v. Twombly, ___ U.S. ___, 127 S.Ct. 1955, 1960 (2007). See
also, Litchfield v. Spielberg, 736 F.2d 1352, 1357 (9th Cir.
1984), cert. denied, 470 U.S. 1052 (1985). For the purpose of
the motion to dismiss, the complaint is liberally construed in
favor of the plaintiffs, and its allegations are taken as true.
Rosen v. Walters, 719 F.2d 1422, 1424 (9th Cir. 1983).

Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). Substantive law on an issue determines the materiality of
a fact. T.W. Electrical Service, Inc. v. Pacific Electrical
Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987). Whether
the evidence is such that a reasonable jury could return a

---

[4] However, Mayfield was then held on home detention from May
21 through May 24, 2004.

verdict for the nonmoving party determines the authenticity of a
dispute.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).

The moving party has the burden of establishing the absence
of a genuine issue of material fact.  Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986).  If the moving party shows the absence
of a genuine issue of material fact, the nonmoving party must go
beyond the pleadings and identify facts which show a genuine
issue for trial.  Id. at 324.

Special rules of construction apply when evaluating summary
judgment motions: (1) all reasonable doubts as to the existence
of genuine issues of material fact should be resolved against the
moving party; and (2) all inferences to be drawn from the
underlying facts must be viewed in the light most favorable to
the nonmoving party.  T.W. Electrical, 809 F.2d at 630.

                          DISCUSSION

Plaintiffs' Amended Complaint challenges the lawfulness of
the physical searches, electronic eavesdropping and wiretapping
performed pursuant to authorization from the FISC Court in
Washington D.C., and the lawfulness of the government's continued
retention of materials derived from those searches,
eavesdropping, and wiretapping.  Plaintiffs allege that 50 U.S.C.
§ 1804 (electronic surveillance under FISA) and 50 U.S.C. § 1823

(physical searches under FISA) violate the Fourth Amendment[5] on
their face.  Specifically, plaintiffs allege that pursuant to
FISA and in violation of the Fourth Amendment, they were
subjected to secret surveillance and searches of their home, law
office, vehicles, and communications.

Plaintiffs allege their private information gathered
pursuant to those searches has been disseminated to at least
eight agencies of the federal government, including the Central
Intelligence Agency, the National Security Council, the
Department of Defense, the Department of Homeland Security, the
DOJ, the FBI, the Department of the Treasury, and the National
Security Agency.

Plaintiffs challenge the Patriot Act amendments to FISA that
allow federal agents to circumvent Fourth Amendment probable
cause requirements when investigating persons suspected of
crimes.  Amended Complaint, ¶¶ 23-24.  Plaintiffs seek a
declaratory judgment that 50 U.S.C. §§ 1804 and 1823, as amended
by the Patriot Act, violate the Fourth Amendment of the United
States Constitution.  Id. ¶ 25.  Finally, plaintiffs seek their
costs and disbursements necessarily incurred in this lawsuit.

---

[5] The Fourth Amendment states: "The right of the people to
be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures, shall not be violated, and no
Warrants shall issue, but upon probable cause, supported by Oath
or affirmation, and particularly describing the place to be
searched, and the persons or things to be seized."  U.S. Const.
Amend. IV.

<u>Id.</u>

**Background on FISA and the Patriot Act**

FISA was enacted in 1978 to "provide a procedure under which the Attorney General can obtain a judicial warrant authorizing the use of electronic surveillance in the United States for foreign intelligence purposes." S. Rep. No. 95-604, 95th Cong. 2d Sess. 5, reprinted at 1978 U.S.C.C.A.N. 3906. In 1994, FISA was amended to permit applications for orders authorizing physical searches as well as electronic surveillance. 50 U.S.C. §§ 1821-1829.

FISA established two special courts: the FISC, which is comprised of eleven district court judges appointed by the Chief Justice of the United States Supreme Court, and the FISC of Review, which is comprised of three district court or court of appeals judges also appointed by the Chief Justice. 50 U.S.C. § 1803(a),(b). The FISC has jurisdiction to grant or deny applications for orders authorizing electronic surveillance and physical searches under the procedures specified in FISA, and the FISC of Review has jurisdiction to review the denial of any application made under FISA. 50 U.S.C. § 1822(b)-(d).

FISA also allows the Attorney General to authorize the execution of an emergency search or surveillance so long as it is approved by the FISC within 72 hours. 50 U.S.C. § 1824(e)(1)(A). Applications for court orders authorizing searches or

surveillance under FISA are made to the FISC under oath by a
federal officer with the approval of the Attorney General.  50
U.S.C. §§ 1801(g), 1804, 1823.  The application must identify or
describe the target of the search or surveillance, and establish
that the target is either a "foreign power" or an "agent of a
foreign power."  50 U.S.C. §§ 1804(a)(3), 1804(a)(4)(A),
1823(a)(3), 1823(a)(4)(A).  FISA defines "foreign power" to
include a "group engaged in international terrorism."  50 U.S.C.
§§ 1801(a)(1),(4).  The definition of an "agent of a foreign
power" includes any person who "knowingly engages in clandestine
intelligence gathering activities for or on behalf of a foreign
power[,]" or any person who "knowingly engages in sabotage or
international terrorism, or activities that are in preparation
therefor, for or on behalf of a foreign power."  50 U.S.C. §§
1801(b)(2)(A),(c).  Where a "United States person" - a citizen or
a permanent resident alien - is involved, the definition of an
"agent of a foreign power" requires, in most instances, a showing
of criminal activity.  50 U.S.C. §§ 1801(b)(2), (I).

In October 2001, Congress amended FISA to change the
language found in § 1804(a)(7)(B) from "the purpose" of the
search or surveillance is to obtain foreign intelligence
information to "a significant purpose" of the search or
surveillance is to obtain foreign intelligence information.
Congress's intent in amending § 1804(a)(7)(B) was to break down

barriers between criminal law enforcement and intelligence gathering. "Federal officers who conduct electronic surveillance to acquire foreign intelligence information may consult with Federal law enforcement officers . . . to coordinate efforts to investigate or protect against" attack or other grave hostile acts, sabotage or international terrorism, or clandestine intelligence activities by foreign powers or by an agent of a foreign power. 50 U.S.C. § 1806(k)(1)(A)-(C). The Act further provides that coordination "shall not preclude" the government's certification that a significant purpose of the surveillance is to obtain foreign intelligence information, or the issuance of an order authorizing the surveillance. Id. § 1806(k)(2).

Each FISA application must include a certification from a high-ranking Executive Branch official, such as the Director of the FBI, that the official "deems the information sought [by the search or surveillance] to be foreign intelligence information," and that "a significant purpose" of the search or surveillance is to obtain "foreign intelligence information." 50 U.S.C. §§ 1804(a)(7)(A)-(B), 1823(a)(7)(A)-(B). FISA defines "foreign intelligence information" to include information that "relates to, and if concerning a United States person is necessary to" protect the United States from espionage and international terrorism, an actual or potential attack, or the national defense or security of the United States generally. 50 U.S.C. §§

1801(e)(1),(2).

An individual judge of the FISC reviews each FISA application following its submission.  50 U.S.C. §§ 1805, 1824. To approve an application, the judge must find that it establishes "probable cause" to believe that the target of the search or surveillance is a foreign power or an agent of a foreign power.  Where the target of the search or surveillance is a U.S. citizen the judge must also find that the Executive Branch's certification that a significant purpose of the search or surveillance is to obtain foreign intelligence information is not "clearly erroneous."  50 U.S.C. §§ 1805(a)(5), 1824(a)(5); H.R. Rep. No. 95-1283, Part I, 95th Cong. 2d Sess. (1978), at 80-81.

**Plaintiffs' Allegations**

Plaintiffs request a declaration from this court that FISA, as amended by the Patriot Act, violates the Fourth Amendment because it:

> a. permit[s] the federal government to perform covert physical searches and electronic surveillance and wiretaps of the home, office and vehicles of a person without first requiring the government to demonstrate to a court the existence of probable cause that the person has committed a crime;
>
> b. permit[s] the federal government to perform covert physical searches and electronic surveillance and wiretaps of a person without first requiring the government to demonstrate to a court that the primary purpose of the searches and surveillance is to obtain foreign intelligence information; and

      c. permit[s] the federal government to covertly
collect, disseminate and retain information collected
through covert physical searches and electronic
surveillance without first requiring the government to
demonstrate to a court the existence of probable cause
that the person who is the target of physical searches
and electronic surveillance has committed a crime,
or, alternatively, that the primary purpose of the
searches and surveillance [is] to obtain foreign
intelligence information.

<u>Id.</u> at ¶ 25 a-c.

      Prior to the Patriot Act, the government was required to
certify that the <u>primary purpose</u> of its surveillance was to
obtain foreign intelligence information.  The Patriot Act now
authorizes FISA surveillance and searches as long as a
<u>significant purpose</u> of the surveillance and searches is the
gathering of foreign intelligence.  50 U.S.C. §§ 1804(a)(7)(B)
and 1823(a)(7)(B).  This amendment allows the government to
obtain surveillance orders under FISA even if the government's
primary purpose is to gather evidence of domestic criminal
activity.  <u>See</u> <u>In re All Matters Submitted To The Foreign
Intelligence Surveillance Court</u> ("<u>In re FISC</u>"), 218 F.Supp.2d
611, 615 n.2 (FISC 2002).  The practical result of this
amendment, objected to by plaintiffs, is that in criminal
investigations, the government can now avoid the Fourth
Amendment's probable cause requirement when conducting
surveillance or searches of a criminal suspect's home or office
merely by asserting a desire to also gather foreign intelligence
information from the person whom the government intends to

Page 19 - OPINION AND ORDER

criminally prosecute.  The government is now authorized to
conduct physical searches and electronic surveillance upon
criminal suspects without first proving to an objective and
neutral magistrate that probable cause exists to believe that a
crime has been committed.  The government need only represent
that the targeted individual was an agent of a foreign power (a
representation that must be accepted unless "clearly erroneous")
and that "a significant purpose" of the surveillance and search
is to collect foreign intelligence.

Here, the government chose to go to the FISC, despite the
following evidence: Mayfield did not have a current passport; he
had not been out of the country since completing his military
duty as a U.S. Army lieutenant in Germany during the early 1990s;
the fingerprint identification had been determined to be
"negative" by the SNP; the SNP believed the bombings were
conducted by persons from northern Africa; and there was no
evidence linking Mayfield with Spain or North Africa.  The
government nevertheless made the requisite showing to the FISC
that Mayfield was an "agent of a foreign power."  That
representation, which by law the FISC could not ignore unless
clearly erroneous, provided the government with sufficient
justification to compel the FISC to authorize covert searches and
electronic surveillance in support of a criminal investigation.

**(1)  Defendant's Motion to Dismiss Plaintiffs' Amended Complaint**

A. STANDING

The defendant argues that this court lacks jurisdiction over plaintiffs' facial constitutional challenge because plaintiffs lack standing to seek declaratory relief against 50 U.S.C. §§ 1804 and 1823.  "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'"  Allen v. Wright, 468 U.S. 737, 750 (1984).  To show standing, plaintiffs must satisfy three elements: (1) an injury-in-fact which is concrete and particularized, and actual or imminent; (2) a casual connection between the injury and the government's conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)(internal quotation marks and citations omitted).

The defendant asserts that plaintiffs must show the FISA provisions are causing them an ongoing injury-in-fact or are likely to injure them in the future.  Plaintiffs allege they "fear future uses of FISA, as amended by the Patriot Act." Amended Complaint, ¶ 25.  Second, plaintiffs allege they "fear the future uses of the derivative materials in government files." Id.  Finally, plaintiffs allege the government's mere possession of derivative FISA materials injures them.  Id.

Specifically, plaintiffs allege that prior to the

Page 21 - OPINION AND ORDER

commencement of this lawsuit, Mayfield, through his court-
appointed public defenders, demanded that then Attorney General
John Ashcroft detail the FISA searches and surveillance performed
and purge all government files of the information collected.
Ashcroft refused to do so, and plaintiffs allege that several
federal agencies continue to retain information collected during
the allegedly illegal and unconstitutional searches and
surveillance.  Amended Complaint, ¶ 25.

It is uncontested that plaintiffs have settled all claims
for any past injuries, and as a matter of law past injuries do
not support standing to seek prospective relief such as a
declaratory judgment of facial unconstitutionality.  In addition,
the defendant asserts that plaintiffs cannot show that their
alleged fear of future use of derivative FISA materials would be
redressed by the only relief they can obtain - a declaratory
judgment that 50 U.S.C. §§ 1804 and 1823 violate the Fourth
Amendment on their face.  The government contends that such a
declaratory judgment would protect plaintiffs against future
searches or surveillance targeting them under a struck-down
provision, but it would not prohibit any and all use of materials
already in the government's possession.

The court disagrees.  Plaintiffs' claims allege an on-going
'case' or 'controversy' providing this court with jurisdiction to
adjudicate plaintiffs' claims pursuant to Article III.

Page 22 - OPINION AND ORDER

Specifically, plaintiffs establish standing with an on-going actual injury-in-fact which is concrete and particularized; that is, the government's continued retention of derivative FISA materials collected by covert surveillance and searches from Mayfield, his wife, and their children.  "Derivative FISA materials" are defined as follows: "[A]ny materials, in whatever form or place, derived directly or indirectly from or related to the FISA take as defined herein[.]"  Settlement Agreement, Def's Ex. 1.  The government provides that derivative materials may include photocopies or photographs of documents from confidential client files in Mayfield's law office, summaries and excerpts from the computer hard drives from the Mayfield law office and plaintiffs' personal computers at home, analysis of plaintiffs' personal bank records and bank records from Mayfield's law office, analysis of client lists, websites visited, family financial activity, summaries of confidential conversations between husband and wife, parents and children, and other private activities of a family's life within their home.  These materials, in a derivative form, have been distributed to various government agencies.  The continued retention by government agencies of this material constitutes a real and continuing injury-in-fact to plaintiffs.[6]

_____

[6] The court received the government's late filing titled, "Notice of Supplemental Information."  The court appreciates the distinction between plaintiffs' pending FOIA requests (the

Page 23 - OPINION AND ORDER

Moreover, the cases relied upon by the government to support its contention that plaintiffs lack standing are distinguishable. These cases focus on claims that a past injury might occur again. Plaintiffs do not rely on their past injury. Rather they continue to suffer a present, on-going injury due to the government's continued retention of derivative material from the FISA seizure.

The government next asserts that a declaratory judgment will fail to effectively "cure" any injury alleged by plaintiffs. If plaintiffs prevail on their Amended Complaint, and the court enters a declaratory judgment finding the challenged portions of the Patriot Act unconstitutional, it is reasonable to assume that the Executive Branch of the government will act lawfully and make all reasonable efforts to destroy the derivative materials when a final declaration of the unconstitutionality of the challenged provisions is issued. This is sufficient to confer standing in this case. See, e.g., Larson v. Valente, 456 U.S. 228, 243 n.15 (1982)("plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.")(emphasis in original).

B. RIPENESS

Next, the defendant argues that plaintiffs cannot establish

"14,754 pages) and the remaining derivative FISA materials.

that their claim is ripe.  Ripeness is designed to "'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract agreements.'  [The Court's] role is neither to issue advisory opinions nor to declare rights in hypothetical cases." Thomas v. Anchorage Equal Rights Comms., 220 F.3d 1134, 1138 (9th Cir. 2000)(en banc)(quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967)).  To satisfy "this jurisdictional prerequisite," the court must determine whether "plaintiffs face 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'" Id. (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

The defendant contends that plaintiffs' failure to establish a sufficient likelihood of future injury also renders their claim for declaratory relief unripe.  The government argues it would be "purely hypothetical and speculative to imagine that plaintiffs ever would be targeted for future searches or surveillance under the challenged provisions or that plaintiffs would ever be harmed by any future use of derivative FISA materials."  Defendant's Memo, p. 3.

It is notable that, "in many cases, ripeness coincides squarely with standing's injury in fact prong." Thomas, 220 F.3d at 1138.  In fact, when "measuring whether the litigant has asserted an injury that is real and concrete rather than

speculative and hypothetical, the ripeness inquiry merges almost completely with standing." Id. at 1139 (internal quotation omitted).  Here, we have neither a hypothetical case nor an abstract agreement.  As discussed above, a declaratory judgment striking the challenged sections of FISA will require the Executive Branch to destroy or otherwise eliminate the derivative materials currently maintained in government files.  I find plaintiffs have established an injury-in-fact, an injury that is continuing and redressable.  Thus, plaintiffs' injury is neither hypothetical nor speculative, and therefore, this claim is ripe for determination by this court.

In conclusion, defendant's motion to dismiss plaintiffs' Amended Complaint based on this court lacking jurisdiction is denied.

**(2) Parties' Cross-Motions for Summary Judgment**

A. Standard for Facial Challenge to a Statute

The defendant relies on United States v. Salerno, 481 U.S. 739, 745 (1987), to argue that a successful facial challenge to a statute "must establish that no set of circumstances exists under which the Act would be valid."  First, this standard is more flexible than defendant represents, and second, plaintiffs adequately allege a facial challenge to the statute regardless of the standard applied.

For example in Planned Parenthood v. Casey, the Court held

that a statute restricting access to abortion could be facially
challenged if it presented an "undue burden" upon a
constitutional right.  505 U.S. 833, 876-77 (1992).  Notably,
after the Court decided Casey, Justice Stevens stated that he did
"not believe the Court has ever actually applied such a strict
standard [as the Salerno standard], even in Salerno itself."
Washington v. Glucksberg, 521 U.S. 702, 739-40 (1997)(Steven, J.,
concurring in judgment).  Additionally, in 1999, in a facial
challenge to a gang loitering ordinance, Justices Stevens, Souter
and Ginsberg labeled the Salerno standard "dictum" and stated
that "[t]o the extent we have consistently articulated a clear
standard for facial challenges, it is not the Salerno
formulation, which has never been the decisive factor in any
decision of this Court, including Salerno itself."  City of
Chicago v. Morales, 527 U.S. 41, 55 n.22 (1999).

    The Ninth Circuit, sitting en banc, determined the Casey
standard to be the appropriate standard for a facial challenge to
the Washington Natural Death Act.  Compassion in Dying v. State
of Washington, 79 F.3d 790, 798 n.9 (9th Cir. 1995)("[S]ince the
claimed liberty issue in this case is in many respects similar to
the liberty issue involved in Casey, . . . we believe that the
Salerno test would not in any event be the appropriate one for
adjudicating a facial challenge to Washington's prohibition on
assisted suicide."), rev'd on other grounds, Washington v.

<u>Glucksberg</u>, 521 U.S. 702 (1997).  <u>See also</u> <u>Planned Parenthood of</u>
<u>Southern Arizona v. Lawall</u>, 180 F.3d 1022 (9th Cir.
1999)(application of <u>Casey</u> standard in abortion challenge).
Subsequently, the Ninth Circuit held that while "<u>Casey</u> 'overruled
<u>Salerno</u> in the context of facial challenge to abortion statutes,'
. . . [it would] not reject <u>Salerno</u> in other contexts until a
majority of the Supreme Court clearly directs us to do so."  <u>S.D.</u>
<u>Myers, Inc. v. City and County of San Francisco</u>, 253 F.3d 461,
467 (9th Cir. 2001).

        Because the standard for reviewing a facial challenge to a
statute involving the violation of a fundamental civil liberty is
in flux, the court will consider whether plaintiffs' facial
challenge satisfies either standard.  Under <u>Casey</u>, plaintiffs
must allege that the challenged sections of FISA, as amended by
the Patriot Act, place an "undue burden" on the fundamental
rights secured by the Fourth Amendment.  Under the <u>Salerno</u>
standard, plaintiffs must show that no set of circumstances can
make constitutional the challenged sections of FISA, as amended
by the Patriot Act.  Plaintiffs satisfy either standard.

        B.  Constitutionality of FISA, as amended by the Patriot Act
        At issue here are two fundamental concerns: the safety of
our nation and the constitutional rights of citizens.  With the
passage of the Patriot Act, these concerns are now placed in
conflict.  The court recognizes that a difficult balance must be

struck in a manner that preserves the peace and security of our nation while at the same time preserving the constitutional rights and civil liberties of all Americans.[7]

Prior to passage of the Patriot Act, the government would have been required to follow the traditional process and demonstrate probable cause to a "detached and neutral magistrate" that Mayfield had committed a crime.  Therefore, prior to issuing a search warrant, the Fourth Amendment required that law enforcement have reasonable grounds to believe that the law was being violated.  FISA does not contain this criminal standard of probable cause.  Instead, FISA contains a "foreign intelligence standard" of probable cause which requires a showing that the target may be an agent of a foreign government and the place or facility to be searched is being used in furtherance of espionage or terrorist activities.

Significantly, a seemingly minor change in wording has a dramatic and significant impact on the application of FISA.  A warrant under FISA now issues if "a significant purpose" of the surveillance is foreign intelligence.  Now, for the first time in our Nation's history, the government can conduct surveillance to gather evidence for use in a criminal case without a traditional warrant, as long as it presents a non-reviewable

---

[7] See Doe v. Gonzalez et al., CV 04-2614 (S.D.N.Y. Sept. 6, 2007)(sections of the Patriot Act, as amended, authorizing the issuance of "national security letters" held unconstitutional).

assertion that it also has a significant interest in the targeted person for foreign intelligence purposes.

Since the adoption of the Bill of Rights in 1791, the government has been prohibited from gathering evidence for use in a prosecution against an American citizen in a courtroom unless the government could prove the existence of probable cause that a crime has been committed.  The hard won legislative compromise previously embodied in FISA reduced the probable cause requirement only for national security intelligence gathering. The Patriot Act effectively eliminates that compromise by allowing the Executive Branch to bypass the Fourth Amendment in gathering evidence for a criminal prosecution.

In 1967, the Supreme Court held that a New York statute authorizing electronic surveillance violated the Fourth Amendment because: (1) "it did not requir[e] the belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described;" (2) it failed to limit the duration of the surveillance to impose sufficiently stringent requirements on renewals of the authorization; and (3) the statute "has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts." Berger v. New York, 388 U.S. 41, 58-60 (1967).

The Court specifically rejected the state's argument that

Fourth Amendment requirements should be relaxed because the
surveillance statute was essential in its fight against organized
crime.  The Court held:

> [W]e cannot forgive the requirements of the Fourth
> Amendment in the name of law enforcement.  This is
> no formality that we require today but a fundamental
> rule that has long been recognized as basic to the
> privacy of every home in America.  While the
> requirements of the Fourth Amendment are not inflexible,
> or obtusely unyielding to the legitimate needs of law
> enforcement, it is not asking too much that officers
> be required to comply with the basic command of the
> Fourth Amendment before the innermost secrets of
> one's home or office are invaded.  Few threats to
> liberty exist which are greater than that posed by
> the use of eavesdropping devices.

Id. at 62-63 (internal quotation and citation omitted).

    Subsequently, the Supreme Court in Katz v. United States,
389 U.S. 347 (1967), held that the Fourth Amendment's probable
cause and warrant requirements apply to electronic surveillance.
In a footnote, however, the majority opinion expressly deferred
deciding whether the Fourth Amendment requires prior judicial
authorization of surveillance in cases involving national
security.  Id. at 358 n.23.  Four years later, the Supreme Court
revisited the issue in United States v. United States District
Court, 407 U.S. 297 (1972)(Keith).  That case arose from the
prosecution of three citizens who were allegedly conspiring to
bomb a CIA office in Ann Arbor, Michigan.  Id. at 299.  While the
Supreme Court recognized both the Executive Branch's interest in
protecting national security and the value of electronic

surveillance in detecting security threats, the Court nonetheless
noted:

> There is understandably, a deep-seated uneasiness and
> apprehension that this [surveillance] capability
> will be used to intrude upon cherished privacy of
> law-abiding citizens.  We look to the Bill of Rights
> to safeguard this privacy.  Though physical entry
> of the home is the chief evil against which the
> wording of the Fourth Amendment is directed, its
> broader spirit now shields private speech from
> unreasonable surveillance.

Id. at 312-13(footnote omitted).

Ultimately, the Court rejected the Executive Branch's
arguments that "internal security matters are too subtle and
complex for judicial evaluation" and that "prior judicial
approval will fracture the secrecy essential to official
intelligence gathering."  Id. at 320.  Significantly, the Supreme
Court expressly rejected the Executive Branch's argument that
exceptions to the Fourth Amendment warrant requirement should be
recognized for domestic security surveillance and held that the
decision to conduct electronic surveillance cannot be left to the
discretion of law enforcement officials:

> These Fourth Amendment freedoms cannot properly be
> guaranteed if domestic security surveillance may be
> conducted solely within the discretion of the Executive
> Branch. The Fourth Amendment does not contemplate the
> executive officers of Government as neutral and
> disinterested magistrates.  Their duty and responsibility
> are to enforce the laws, to investigate, and to prosecute.
> But those charged with this investigative and prosecutorial
> duty should not be the sole judges of when to
> utilize constitutionally sensitive means in pursuing
> their tasks.  The historical judgment, which the
> Fourth Amendment accepts, is that unreviewed

> executive discretion may yield too readily to
> pressures to obtain incriminating evidence and overlook
> potential invasions of privacy and protected speech.

Id. 316-17 (internal citation and footnote omitted).

Finally, the Supreme Court noted the differences between surveillance for criminal investigative purposes and surveillance for intelligence purposes.  The Court noted the "potential distinctions between Title III criminal surveillance and those involving domestic security," and suggested that Congress "may wish to consider protective standards for the latter which differ from those already prescribed for specified crimes in Title III." Id. at 322.

After the Supreme Court's decision in Keith, and prior to the enactment of FISA, numerous federal appellate courts recognized our Nation's interest in security and affirmed warrantless surveillance authorized within the Executive Branch, because the purpose of the surveillance was foreign intelligence gathering.  See, e.g., United States v. Brown, 484 F.2d 418, 426 (5th Cir. 1973); United States v. Butenko, 494 F.2d 593 (3d Cir. 1974); United States v. Buck, 658 F.2d 871 (9th Cir. 1977).  The Third, Fifth and Ninth Circuits all held that warrantless surveillance could be conducted by the Executive Branch only if the purpose of this surveillance was to gather foreign intelligence.  Brown, 484 F.2d at 426; Butenko, 494 F.2d at 593; and Buck, 658 F.2d at 871.  It was against this backdrop, in

Page 33 - OPINION AND ORDER

1978, that Congress passed FISA, permitting the government to obtain an electronic surveillance order based upon probable cause that the prospective target was a "foreign power" or an "agent of a foreign power."  Pub. L. No. 95-511, § 101, 92 Stat. 1783 (1978).

The decisions in Katz and Keith drew a line between surveillance conducted by law enforcement officials to investigate crime - which requires a traditional warrant based on probable cause - and surveillance conducted by intelligence officials to obtain foreign intelligence information.  Notably, the primary purpose of the electronic surveillance and physical searching of Mayfield's home was to gather evidence to prosecute him for crimes.  Mayfield was ultimately arrested to compel his testimony before a Grand Jury investigating his alleged involvement in the crimes of bombing places of public use, providing national support to terrorists and conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign county.  In Re: Federal Grand Jury 03-01 Matter of Material Witness, No. 04-MC-9071 (D. Or. 2004).  The government stipulated that it did not demonstrate to the FISC that its primary purpose in wiretapping, electronically eavesdropping, or physically searching Mayfield's home or law office was to gather foreign intelligence.  "In the FISA applications, the government did not seek to establish, and under the terms of FISA was not required

Page 34 - OPINION AND ORDER

to establish, all of the requirements set forth in 18 U.S.C. §
2510 et seq. and Rule 41, Fed. R. Crim. P."  Recitation of
Stipulated Facts ("Stip."), ¶ a.   Thus, FISA now permits the
Executive Branch to conduct  surveillance and searches of
American citizens without satisfying the probable cause
requirements of the Fourth Amendment.[8]  As plaintiffs allege,
when proceeding pursuant to FISA, "there is no [need for] showing
or finding that a crime has been or is being committed, as in the
case of a search or seizure for law enforcement purposes."
Plaintiffs' Memo in Support of Summary Judgment, p. 26.
"Additionally, and with respect to the nexus to criminality
required by the definitions of an 'agent of a foreign power,' the
government need not show probable cause as to each and every
element of the crime involved or about to be involved."  Id.
When the FISC reviews a FISA search application, the government
satisfies most FISA requirements simply by certifying that the
requirements are met.  50 U.S.C. § 1804(a)(7).  The statute
directs that the FISC is not to scrutinize such statements, but
is to defer to the government's certification unless it is

---

[8] Members of Congress expressed reservations about the
constitutionality of the "significant purpose" amendment to FISA
in light of the "primary purpose" requirement rooted in the
Fourth Amendment.  147 Cong. Rec. S10593 (Oct. 11, 2001)(Sen.
Leahy); id. at S10568 (Sen. Specter); id. at S10585 (Sen.
Cantwell); id. at S10597 (Sen. Kennedy); id. at E1896 (Oct. 12,
2001)(Rep. Mink); id. at H6760 (Rep. Scott); id. at H6761 (Rep.
Lofgren); id. at H6767 (Rep. Conyers); id. at H6772 (Rep. Udall).

Page 35 - OPINION AND ORDER

"clearly erroneous."  Id. at § 1805(a)(5); § 1824(a).

This procedure allows the government to avoid traditional Fourth Amendment judicial oversight used to obtain a surveillance order.  The government must provide the court with "a full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued."  18 U.S.C. § 2518(1)(b).  The court may "require the applicant to furnish additional testimony or documentary evidence in support of the application."  Id. at § 2518(2).  Finally, as to most substantive requirements, the court must find probable cause to believe they are satisfied.  Id. at § 2518(3).

The FISA also allows the government to retain information collected, and use the collected information in criminal prosecutions without providing any meaningful opportunity for the target of the surveillance to challenge its legality.  Nor does FISA require notice.  The Fourth Amendment ordinarily requires that the subject of a search be notified that the search has occurred.  Although in some circumstances the government is permitted to delay the provision of notice, the Supreme Court has never upheld a statute that, like FISA, authorizes the government to search a person's home or intercept his communications without ever informing the person that his or her privacy has been violated.  Except for the investigations that result in criminal prosecutions, FISA targets never learn that their homes or

Page 36 - OPINION AND ORDER

offices have been searched or that their communications have been intercepted.  Therefore, most FISA targets have no way of challenging the legality of the surveillance or obtaining any remedy for violations of their constitutional rights.

FISA also does not require particularity.  The Fourth Amendment prohibits the government from conducting intrusive surveillance unless it first obtains a warrant describing with particularity the things to be seized as well as the place to be searched.  <u>Berger</u>, 388 U.S. at 58 (Fourth Amendment particularity requirement intended to prevent government's reliance on "general warrants" that allow "seizure of one thing under a warrant describing another").  The Supreme Court has underscored the importance of the particularity requirement:

> By its very nature eavesdropping involves an intrusion on privacy that is broad in scope . . . . [T]he indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments, and imposes a heavier responsibility on this Court in its supervision of the fairness of procedures.

<u>Id.</u> at 56, 63 (internal quotation marks and citations omitted).

Finally, FISA authorizes surveillance terms up to 120-days.  50 U.S.C. § 1805(e)(1)(B).  Title III limits the term of surveillance to 30 days.  18 U.S.C. § 2518(5).  The Ninth Circuit has held that in the context of criminal investigations, the 30-day limitation is constitutionally required.  <u>United States v. Koyomejian</u>, 970 F.2d 536, 542 (9th Cir.), <u>cert. denied</u>, 506 U.S.

Page 37 - OPINION AND ORDER

1005 (1992).  Given <u>Berger</u> and <u>Koyomejian</u>, FISA's provisions
relating to the duration of surveillance orders violates the
Fourth Amendment requirements for criminal investigations.

The government does not refute plaintiffs' historical
recitation of law leading up to the enactment of FISA.
Similarly, the parties agree that when surveying the case law
prior to <u>In re Sealed Case</u>, 310 F.3d 717 (FISA Ct. of Rev. 2003),
every Article III court that had considered the issue directly
concluded that  to justify non-probable cause searches and
electronic surveillance, the government's purpose, or at least
its primary purpose, must have been the collection of foreign
intelligence.  Specifically, as originally drafted and
implemented over its 24-year history, FISA applications were
properly granted only when "the purpose" of the surveillance was
foreign intelligence gathering.

In the history underlying <u>In re Sealed Case</u>, the government
sought to conduct surveillance of an "agent of a foreign power."
In granting the request, the FISC also addressed the new 2002
FISA Procedures.  On May 17, 2002, the seven judges of the FISC
issued a rare public and unanimous opinion ruling the Procedures
improper.  The FISC court held:

> [The 2002 Procedures] are designed to enhance the
> acquisition, retention, and dissemination of
> <u>evidence for law enforcement purposes, instead</u> of
> being consistent with the need of the United States
> to 'obtain, produce, and disseminate <u>foreign
> intelligence information</u>[.]  The 2002 Procedures

appear to be designed to amend the law and substitute
the FISA for Title III electronic surveillances and
Rule 41 searches.

<u>In re All Matters Submitted To The Foreign Intelligence
Surveillance Court</u>, 218 F.Supp.2d 611, 623 (FISC 2002) (<u>In re
FISC</u>)(emphasis in original).

The government filed the first ever appeal to the FISCR, a
court that had never before met.  The FISCR reversed the FISC's
ruling and held the 2002 Procedures consistent with the Patriot
Act, found the 2002 Procedures constitutionally reasonable, and
held that they met Fourth Amendment standards.  While the court
permitted <u>amicus</u> briefs, only the government was allowed to
appear and participate at oral argument.  Moreover, only the
government is allowed under FISA to seek Supreme Court review of
a FISCR decision, which it declined to do.  Even without the
benefit of full adversarial proceedings, the FISCR conceded that
"the constitutional question presented by this case - whether
Congress' disapproval of the primary purpose test is consistent
with the Fourth Amendment - has no definitive jurisprudential
answer."  <u>In re Sealed Case</u>, 310 F.3d at 743.

The government cites <u>In re Sealed Case</u> as "highly
persuasive" authority for this court and suggests that the Ninth
Circuit would adopt the ruling.[9]  The government cites both

_____

    [9] The government recently provided the court with a copy of
<u>United States v. Holy Land Found. for Relief and Dev.</u>, 2007 WL
2011319 (N.D. Tex. July 11, 2007), in which the court decided a

United States v. Cavanagh, 807 F.2d 787 (9th Cir. 1987), and
United States v. Sarkissian, 841 F.2d 959 (9th Cir. 1988), as
evidence that the Ninth Circuit would follow the ruling of In re
Sealed Case.  Both Ninth Circuit cases were decided prior to the
Patriot Act's amendments to FISA.  Regardless, I disagree with
the government's analysis and find those cases are not persuasive
as to whether the Ninth Circuit would adopt the reasoning of In
re Sealed Case.  For example, in Cavanagh the court held that
where "the purpose of the surveillance is to obtain foreign
intelligence," FISA passes constitutional muster.  Id. at 790-91.
In Sarkissian, the Ninth Circuit expressly declined to consider
whether the primary purpose test was constitutionally required.
871 F.2d at 964 ("We also decline to decide the issue.  We have
generally stated that the purpose of the surveillance must be to
secure foreign intelligence information.").

    In this case, the court declines to adopt the analysis and
conclusion reached by the FISCR in In re Sealed Case.  Notably,
the FISCR's two fundamental premises underlying its ruling are
contradictory.  FISCR determined both that FISA never contained a

---

motion to compel production of documents related to the
government's applications under FISA and a motion to suppress
evidence obtained from that surveillance.  The court denied the
motions rejecting defendants' Fourth Amendment challenge, and
relied on the "thorough analy[sis]" by the FISCR in In re Sealed
Case.  I find this case simply reiterates the analysis of In re
Sealed Case, and therefore does not aid in the resolution of this
difficult issue.

purpose requirement, and that in altering the purpose requirement, Congress did not undermine the validity of searches conducted pursuant to FISA.  Regarding FISCR's second premise, FISCR found that the primary purpose test "generates dangerous confusion and creates perverse organizational incentives arising from the purported need to distinguish between intelligence gathering and criminal investigation."  Id. at 743.  However, a provision of the Patriot Act, unchallenged by plaintiffs here, eliminates the DOJ "wall" and with it the "dangerous confusion" and "perverse organizational incentives" referred to and relied on by the FISCR.  Moreover, to the extent the "primary purpose" test imposes any restraint on the sharing of FISA surveillance with criminal investigators, investigators are, of course, free to seek orders authorizing surveillance under Title III, and traditional search warrants that satisfy Fourth Amendment requirements.  Finally, Title III includes predicate offenses for which surveillance is justified for virtually all terrorism and espionage-related offenses.  18 U.S.C. § 2516(1).  As such, Title III provides a satisfactory alternative when criminal investigators cannot have access to FISA surveillance.

The FISCR also attempts, without merit, to distinguish the Supreme Court's "special needs" cases.  In re Sealed Case, 310 F.3d at 745-46 n. 33.  "Special needs" cases are those where the Supreme Court has found it appropriate to carve out an exception

Page 41 - OPINION AND ORDER

to the Fourth Amendment's requirement of probable cause based upon an individualized suspicion of wrongdoing.  In these cases, the Court found that special needs, beyond the normal need of law enforcement, might justify an otherwise unconstitutional search. Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 619 (1989).  Prior to the Patriot Act, FISA may have had as its "general programmatic purpose . . . to protect the nation against terrorism and espionage threats directed by foreign powers."  In re Sealed Case, 310 F.3d at 46.  After the Patriot Act, however, FISA surveillance, including the surveillance at bar, may have as its "programmatic purpose" the generation of evidence for law enforcement purposes - which is forbidden without criminal probable cause and a warrant.

Finally and perhaps most significantly, In re Sealed Case ignores congressional concern with the appropriate balance between intelligence gathering and criminal law enforcement.  It is notable that our Founding Fathers anticipated this very conflict as evidenced by the discussion in the Federalist Papers. Their concern regarding unrestrained government resulted in the separation of powers, checks and balances, and ultimately, the Bill of Rights.  Where these important objectives merge, it is critical that we, as a democratic Nation, pay close attention to traditional Fourth Amendment principles.  The Fourth Amendment has served this Nation well for 220 years, through many other

perils.  Title III, like the Supreme Court's pronouncements in
Katz and Berger, recognizes that wiretaps are searches requiring
fidelity to the Fourth Amendment.

Moreover, the constitutionally required interplay between
Executive action, Judicial decision, and Congressional enactment,
has been eliminated by the FISA amendments.  Prior to the
amendments, the three branches of government operated with
thoughtful and deliberate checks and balances - a principle upon
which our Nation was founded.  These constitutional checks and
balances effectively curtail overzealous executive, legislative,
or judicial activity regardless of the catalyst for
overzealousness.  The Constitution contains bedrock principles
that the framers believed essential.  Those principles should not
be easily altered by the expediencies of the moment.

Despite this, the FISCR holds that the Constitution need not
control the conduct of criminal surveillance in the United
States.  In place of the Fourth Amendment, the people are
expected to defer to the Executive Branch and its representation
that it will authorize such surveillance only when appropriate.
The defendant here is asking this court to, in essence, amend the
Bill of Rights, by giving it an interpretation that would deprive
it of any real meaning.  This court declines to do so.

For over 200 years, this Nation has adhered to the rule of
law - with unparalleled success.  A shift to a Nation based on

Page 43 - OPINION AND ORDER

extra-constitutional authority is prohibited, as well as ill-advised.  In this regard, the Supreme Court has cautioned:

> The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power.  Nor must the fear of unauthorized official eavesdropping deter vigorous citizen dissent and discussion of Government action in private conversation. For private dissent, no less than open public discourse, is essential to our free society.

Keith, 407 U.S. at 314.

Therefore, I conclude that 50 U.S.C. §§ 1804 and 1823, as amended by the Patriot Act, are unconstitutional because they violate the Fourth Amendment of the United States Constitution. Plaintiffs' Amended Complaint for declaratory relief is granted.

### CONCLUSION

Based on the foregoing, plaintiffs' motion for summary judgment (doc. 126) is granted.  Defendant's motion to dismiss the Amended Complaint (doc. 134) or cross-motion for summary judgment (doc. 134) is denied.  The parties have until November 1, 2007, to submit a stipulation regarding costs, or file briefs regarding this issue.

IT IS SO ORDERED.

Dated this  26  day of September, 2007.


             /s/ Ann Aiken
              Ann Aiken
        United States District Judge


Page 44 - OPINION AND ORDER